## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BARBARA ZAKHAR, individually, | : | Civil Action No. |
| and on behalf of all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | **CLASS ACTION COMPLAINT** |
| v. | : | |
| | : | |
| KARMA CULTURE LLC, | : | |
| a New York corporation, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | May 14, 2014 |

### CLASS ACTION COMPLAINT

Plaintiff, Barbara Zakhar ("Zakhar" or "Plaintiff"), by and through her attorneys, brings this action on behalf of herself and all others similarly situated against Defendant, Karma Culture LLC ("Defendant"), and alleges on personal knowledge as to all facts related to herself and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action individually and on behalf of a proposed class ("Class"), as more fully defined below, of similarly situated consumers in Connecticut seeking to redress the pervasive pattern of fraudulent, deceptive, false, and otherwise improper advertising, sales, and marketing practices that Defendant engages in regarding its Karma Wellness Water products ("Karma" or "Product(s)").

2.      Defendant manufactures, markets, and sells Karma, which is a line of beverage products with vitamins and other ingredients stored in the cap to be released into the bottle upon

-1-

consumption of the product. According to Defendant: "Karma is available in five varieties that have been meticulously formulated to deliver their own distinct wellness benefits through a precise combination of vitamins and nutrients." *See* http://www.drinkkarma.com/faq/. Flavors include Acai Pomberry (Balance), Coconut Pineapple (Vitality), Raspberry Guava Jackfruit (Body), Passionfruit Green Tea (Spirit), and Orange Mango (Mind).

3.      On Karma's labels, and through an extensive and comprehensive marketing campaign which includes, *inter alia*, print, internet and social media advertising, as well as a website at http://www.drinkkarma.com/ (the "Karma website"), Defendant claims that Karma's "in the cap" vitamins are materially fresher and more potent than vitamins pre-mixed in water. According to Defendant, this is because "vitamins deteriorate in water," whereas "Karma's nutrients are stored in the cap until you release them, assuring optimal freshness and potency." Defendant further claims, "[B]y introducing the vitamins only seconds or minutes from actual consumption, it optimizes the effectiveness of the nutrient-rich ingredients. Karma contains a generous amount of vitamins and nutrients, and that by itself is why Karma is a premium product." These claims are false and misleading.

4.      Plaintiff brings this action, on behalf of herself and other similarly situated Connecticut consumers, to halt the dissemination of this false and misleading advertising, correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have purchased Karma. Plaintiff alleges violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq*. ("CUTPA"); breach of express warranty; and unjust enrichment.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2).  The

matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000

and Plaintiff and members of the Class are citizens of a state different from Defendant.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendant:

(a) is authorized to conduct business in this district and has intentionally availed itself of the laws

and markets within this district through the promotion, marketing, distribution and sale of the

Products here; (b) does substantial business in this district; and (c) is subject to personal

jurisdiction in this district.

## PARTIES

7.      Plaintiff is, and at all times relevant to this action has been, a resident of Old

Saybrook, Middlesex County, Connecticut and, thus, is a citizen of Connecticut.  Prior to

purchasing Karma, Plaintiff was exposed to and saw Defendant's claims concerning vitamin

deterioration, freshness, and potency and she purchased Karma in reliance thereon.  Plaintiff

suffered injury in fact and lost money as a result of Defendant's false and misleading conduct.

8.      Defendant is a limited liability corporation organized under the laws of the State

of New York and is based in Pittsford, New York.  Therefore, Defendant is a citizen of New

York.  Defendant markets and sells Karma throughout the country, including in Connecticut.

## SUBSTANTIVE ALLEGATIONS

9.      In attempting to capitalize on the large market for health and wellness products,

Defendant created a so-called transformational product, which promises to "transfer water into

wellness."  According to its advertisements, Karma is a "truly enlightened product, born out of

the idea that what goes around comes around. A product based on the simple belief that if you do something positive—for others, or for yourself—you'll get something positive back in return. When you think about it, it just makes sense: make good choices, and you'll see and feel the benefits. Like choosing a drink that transforms pristine spring water into wellness water, creating positive effects for your mind, body, spirit, balance, and vitality."

*See* http://www.drinkkarma.com/about/.

10.     Defendant also states, in its advertising message, that "[s]ince vitamins deteriorate in water, too many products available today are flawed.  With Karma, consumers finally get a nutrient-enhanced water that delivers on its promise, allowing them to take responsibility today for tomorrow by creating positive effects on the mind, body, spirit, balance, and vitality."

*See* http://www.drinkkarma.com/faq/.

11.     Through its product packaging, print advertising, internet advertising, and social media advertising, Defendant has made, and continues to make, statements which convey the message that Karma's vitamins are materially fresher and more potent than products with vitamins pre-mixed in water, although they are not.

12.     Specifically, Defendant states on the Karma label that, "Vitamins deteriorate in water, causing premixed vitamin drinks to lose their strength.  Karma's nutrients are stored in the cap until you release them, assuring optimal freshness and potency":



13.     Defendant also states on the Karma label that, "KarmaCap technology instantly enables the infusion of fresh, natural vitamins and nutrients into pristine spring water to transform water into wellness":



14.     Defendant further represents on its website:

*       "Vitamins such as water soluble vitamins lose potency while sitting in water or exposed to moisture.  Additionally, vitamins suffer degradation while they are exposed to UV rays, oxygen and heat.  The loss is greater when the vitamin contents are spread across the full contents of bottled beverages.  The broader the surface area, the greater the exposure.  In sharp contrast, Karma's vitamins are stored dry in the hermetically sealed cap, the vitamins are stored in a condensed area which limits exposure to the elements, and Karma makes use of opaque plastic and a UV blocker in its cap.  Each of the differences in Karma are designed to enhance the longevity of shelf-life and therefore increase potency at time of consumption.  By introducing the vitamins only seconds or minutes from actual consumption, it optimizes the effectiveness of the nutrient-rich ingredients.  Karma contains a generous amount of vitamins and nutrients, and that by itself is why Karma is a premium product."  *See* http://www.drinkkarma.com/faq/.

*       "Vitamins and nutrients delivered at maximum potency and peak freshness thanks to our patented, one-of-a-kind KarmaCap."

*See* http://www.drinkkarma.com/about/why-drink-karma/.

*       "Vitamins deteriorate in water, so premixed vitamin drinks can lose their strength over time.  But because we chose to keep Karma's ingredients in a patented KarmaCap until you're ready to mix them, you're able to enjoy all their benefits at maximum potency."  *See* http://www.drinkkarma.com/about/.

*       "[P]eel off protective seal . . . push to infuse fresh vitamins . . . shake to initiate health benefits . . . transform into wellness water."

*See* http://www.drinkkarma.com/about/how-it-works/.

15.     These representations were material to Plaintiff and other consumers, and Plaintiff and other consumers reasonably relied on the representations in purchasing Karma.

16.     Defendant's advertising campaign has been extensive and comprehensive, consistently conveying these deceptive messages to consumers throughout Connecticut and the United States.  Defendant conveyed and continues to convey its deceptive claims about Karma through a variety of media, including product packaging, billboards, magazines, and the internet.

17.     Defendant's deception is even worse, as it touts its so-called advisory team of three "experts" to attempt to bolster its claims.  But, Defendant's claims are false, as all available scientific evidence clearly shows that Karma's vitamins are **not** materially fresher and more potent than vitamins pre-mixed in water.

18.     For example, in 1982, *The Journal of Pharmaceutical Sciences* published a peer-reviewed study finding the key vitamins contained in Karma to be stable when in an aqueous solution (water): Vitamins A (palmitate), B3 (niacin), B5 (calcium pantothenate), B6 (pyridoxine hydrochloride), B12 (cyanocobalamin), and E (d-alpha-tocopheryl acetate).

19.     Specifically, *The Journal of Pharmaceutical Sciences* study found that palmitate, the form of Vitamin A used in Karma, is the most stable form of the vitamin in aqueous solution.  The study further found that stability can be enhanced by adding antioxidants to a solution, as Defendant has done with the wide mixture of vitamins, minerals, and antioxidants in the Products.  Niacin (also called nicotinic acid), the form of Vitamin B3 used in Karma, was also found to be normally very stable, while also finding that calcium pantothenate, the form of Vitamin B5 used in Karma, and pyridoxine hydrochloride, the form of Vitamin B6 used in Karma, are stable in aqueous solution.  Cyanocobalamin, the form of Vitamin B12 used in

-8-

Karma, was found to be the most stable form of Vitamin B12 and stable in aqueous solution. D-alpha-tocopheryl, the form of Vitamin E used in Karma, was also found to be very stable in aqueous solution.

20.     Consequently, Defendant's claims that Karma's "in the cap" vitamins are materially fresher and more potent than vitamins pre-mixed in water because "vitamins deteriorate in water," whereas "Karma's nutrients are stored in the cap until you release them, assuring optimal freshness and potency," are false and misleading to the reasonable consumer.

21.     Defendant's advertising and marketing campaign is designed to cause consumers to purchase Karma as a result of this deceptive message, and to allow Defendant to sell Karma at a premium price, substantially higher than other vitamin drinks.  And Defendant has succeeded: on information and belief, as a result of its campaign, Karma has rapidly increased Defendant's revenue since coming to market.  Indeed, according to Defendant, Karma is sold in numerous stores across the country.  *See* http://www.drinkkarma.com/where-to-buy/.

22.     As a result of Defendant's tactics and based on its misrepresentations, Plaintiff viewed the label and thereafter purchased the Products at a premium price.  Had Plaintiff and other members of the proposed Class been aware of the truth, they would not have purchased the more expensive Products.  Plaintiff suffered ascertainable loss, injury in fact, and lost money and/or property as a result of the conduct described of herein.

23.     Defendant has continued to market, advertise, and sell Karma to consumers despite knowing that its deterioration, freshness, and potency claims are patently false and deceptive.

## PLAINTIFF'S EXPERIENCE WITH KARMA

24.     The printed advertisements, internet advertising and the labeling of the Products, and the representations therein, were made by Defendant.  Reasonably relying on the claims made in the pervasive advertising message disseminated by Defendant through printed advertisements, as well as on the labeling of the Product, Plaintiff viewed the label and purchased Karma.  Plaintiff reasonably expected that the vitamins in the Product would, in fact, be more fresh and potent as the labeling conveyed they would be.

25.     In or about the Fall of 2012, Plaintiff was shopping in a Marshalls store in Old Saybrook, Connecticut.  While shopping, she saw bottles of the Product on the store shelf.  Upon seeing Karma, she recalled a recent magazine advertisement for the Product that she had seen and which had piqued her interest.  Plaintiff then read the claims appearing on Karma's labels, which conveyed the message that Karma's vitamins were more "fresh" and potent since they were not pre-mixed in water, that Karma's vitamins did not fade away, and that Karma offered various health benefits, such as improved energy and memory.  Based on viewing these representations on the label, Plaintiff understood that the Product was fresher and more potent than other vitamin waters.

26.     As a result of this understanding, and in reliance on the label's claims, she purchased and consumed the Product through early 2014.  Plaintiff purchased Karma on multiple occasions at various retail stores, including Marshalls and HomeGoods in Old Saybrook, Connecticut, and T.J. Maxx in Clinton, Connecticut, typically buying multiple bottles at a time for approximately $1.79 to $1.99 per bottle plus tax.  On November 3, 2012, she bought two Karma bottles from T.J. Maxx for $1.99 per bottle; on December 9, 2012, she bought one Karma

bottle from Marshalls for $1.99 per bottle; on January 23, 2013, she bought two Karma bottles

from T.J. Maxx for $1.99 per bottle; in or around February or March 2013, she bought two

Karma bottles from T.J. Maxx for $1.79 per bottle; on September 10, 2013, she bought three

Karma bottles from Marshalls for $1.79 per bottle; on October 11, 2013, she bought four Karma

bottles from Marshalls for $1.79 per bottle; in or around October 28, 2013, she bought two

Karma bottles from Marshalls for $1.79 per bottle; on November 1, 2013, she bought six Karma

bottles from HomeGoods for $1.79 per bottle; on December 23, 2013, she bought two Karma

bottles from Marshalls for $1.79 per bottle; and on January 30, 2014, she bought six Karma

bottles from Marshalls for $1.79 per bottle.

27.     Trusting Karma's claims, Plaintiff paid substantially more for the Karma she

purchased, as the typical "premium" that Karma commands as a result of its unique claims is

approximately 20 to 30 percent over and above other vitamin water, which Plaintiff was willing

to, and did, pay because she understood from the labeling that the Product promised benefits of

materially fresher and more potent vitamins.

28.     Plaintiff suffered an ascertainable loss in either the amount of the purchase price

of the Products, or the premium she paid for the Products, as a result of the conduct of Defendant

described herein.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this lawsuit, both individually and as a class action on behalf of a

proposed class, defined as follows:

All persons in the State of Connecticut
who have purchased Karma (the "Class").

30.     Excluded from the Class are:  (1) Defendant, Defendant's subsidiaries, affiliates,

officers, directors, assigns and successors, and any entity in which Defendant has a controlling

interest; (2) the judge to whom this case is assigned and any member of the judge's immediate

family; (3) anyone who purchased Karma for the purpose of resale; and (4) anyone asserting

claims for personal injury.  Plaintiff reserves the right to modify the Class definition as further

investigation and discovery so warrants.

31.     **Numerosity.** The members of the Class are so numerous that joinder of all

members is impracticable.  Plaintiff reasonably believes that the Class is comprised of thousands

of consumers in Connecticut.

32.     **Common Questions of Law Predominate.**  Common questions of law and fact

exist as to all members of the Class.  These common questions predominate over any questions

affecting only individual Class members.  These common legal and factual questions include, but

are not limited to, the following:

(a)     whether Defendant's claims regarding Karma are deceptive and
        misleading;

(b)     whether Defendant engaged in false and misleading advertising;

(c)     whether Defendant's conduct as alleged herein violates the CUTPA;

(d)     whether Defendant's conduct as alleged herein constitutes a breach of
        warranty;

(e)     whether Defendant has been unjustly enriched by the conduct alleged
        herein;

(f)     whether Plaintiff and Class members have sustained monetary loss and the

-12-

proper measure of that loss; and

(g)     whether Plaintiff and Class members are entitled to declaratory and injunctive relief.

33.     **Typicality.**  Plaintiff's claims are typical of the claims of the members of the Class, as all Class members are similarly affected by Defendant's wrongful conduct.  Plaintiff, like other members of the Class, purchased Karma after exposure to the same material misrepresentations appearing on and in the product packaging, including Karma's labels, print advertising, billboards, and the internet, and received a product that was not as represented. Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

34.     **Adequacy of Representation.**  Plaintiff's claims are made in a representative capacity on behalf of the other members of the Class.  Plaintiff has no interests antagonistic to the interest of the other members of the proposed Class and is subject to no unique defenses.

35.     Plaintiff is similarly situated in interest to all members of the proposed Class, is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of consumer class actions.  Accordingly, Plaintiff is an adequate representative of the proposed Class and will fairly and adequately protect the interests of the Class.

36.     **Superiority of Class Action.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive

litigation necessitated by Defendant's conduct.  It would be virtually impossible for members of the Class to individually redress the wrongs done to them effectively.  Even if the members of the Class could afford such litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents no management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

37.     Unless a class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiff and proposed Class members.  Unless an injunction is issued, Defendant will continue to commit the violations alleged, and the members of the Class and the general public will continue to be misled.

## NOTICE TO ATTORNEY GENERAL OF ACTION

38.     A copy of this Complaint shall be mailed to the Attorney General, Administrators, Commissioners, or other officers, as required by the laws of Connecticut, upon and at the time of the filing of the Complaint pursuant to Conn. Gen. Stat. § 42-110g(c).

## COUNT I
### For Violations Of CUTPA (Conn. Gen. Stat. § 42-110a, *et seq.*)

39.     Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

40.     Plaintiff and members of the proposed Class are consumers within the meaning of CUTPA, and the Products are goods within the meaning of the CUTPA.  Defendant, through its

conduct, is engaged in trade or commerce within the meaning of the CUTPA, and the purchase of

Karma by Plaintiff and other members of the proposed Class constitutes consumer transactions

within the meaning of the CUTPA.

41.     By engaging in the foregoing conduct, Defendant committed unfair and deceptive

acts or practices in the conduct of trade or commerce in violation of CUTPA, and particularly,

but without limitation, Defendant engaged in unfair and deceptive acts and practices by and

through the following acts and omissions:

    a.    Defendant made false and/or misleading statements of material fact regarding Karma, which statements were likely to deceive the public;

    b.    Defendant omitted and concealed material facts regarding Karma from Plaintiff and the Class regarding Karma; and

    c.    Defendant knew, or was reckless in not knowing, that its statements about Karma, including its claims of vitamin deterioration, freshness and potency, were false and/or misleading.

42.     Defendant knew or should have known that these acts and omissions violated

CUTPA, as they were and are violative of public policy, unfair, unethical, oppressive,

unscrupulous and caused substantial injury to consumers, including Plaintiff and other members

of the proposed Class.

43.     Defendant used or employed these acts or practices in willful or knowing

violation of CUTPA.

44.     As a result of the unfair and deceptive conduct of Defendant, Plaintiff and

members of the proposed Class have suffered ascertainable losses within the meaning of Conn.

Gen. Stat. § 42-110g(a).  Plaintiff and members of the Class have suffered injury in fact, loss of

money or property in the form of, *inter alia*, monies spent to purchase the Products, or the

premium paid for the Products, and otherwise have been damaged.

45.     Plaintiff and members of the proposed Class are entitled to compensatory damages from Defendant for the economic and non-economic damages identified herein, together with equitable and declaratory relief and other appropriate damages, including punitive damages, attorneys' fees, and costs of suit.

## COUNT II
### Breach Of Express Warranty

46.     Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

47.     Plaintiff, and each member of the Class, formed a contract with Defendant at the time they purchased Karma.  The terms of that contract include the promises and affirmations of fact made by Defendant through its labeling, advertising, and marketing claims relating to Karma, as alleged above, which constitute express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class, on the one hand, and Defendant, on the other.

48.     All conditions precedent to Defendant's liability under the warranty have been performed by Plaintiff and the Class.

49.     Defendant breached the terms of the express warranty by not providing a product that provided the benefits promised.

50.     As a result of Defendant's breach of warranty, Plaintiff and the Class have been damaged in the amount of the purchase price of the Karma they purchased.

## COUNT III
**Unjust Enrichment**

51.     Plaintiff realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

52.     This claim is asserted in the alternative on behalf of Plaintiff and Class members to the extent that any contracts do not govern the entirety of the subject matter of the dispute with Defendant.

53.     Plaintiff and Class members conferred a tangible economic benefit upon Defendant by purchasing Karma.  Plaintiff and Class members would have expected remuneration from Defendant at the time this benefit was conferred had they known that the Products did not perform as promised.

54.     As a direct and proximate result of Defendant's misconduct as set forth above, Defendant has been unjustly enriched, at the expense of Plaintiff and Class members.

55.     It would be inequitable for Defendant to retain the profits, benefits and other compensation obtained by its wrongful conduct in marketing and selling Karma.

56.     Plaintiff, on behalf of herself and Class members, seeks restitution from Defendant and an order of this Court disgorging all profits, benefits and other compensation obtained by Defendant from its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all members of the Class defined herein, prays for judgment as follows:

1.      For preliminary and permanent injunctive relief enjoining Defendant, its agents,

servants and employees, and all persons acting in concert with them, from

engaging in, and continuing to engage in, the unfair, unlawful and fraudulent

business practices alleged above and that may yet be discovered in the prosecution

of this action;

2.   For certification of the putative Class and appointment of Plaintiff as

representative of the Class and her counsel as Class counsel;

3.   For restitution and disgorgement of all money or property wrongfully obtained by

Defendant by means of its herein alleged unlawful, unfair, and fraudulent business

practices;

4.   For an accounting by Defendant for any and all profits derived by Defendant from

its herein alleged unlawful, unfair and fraudulent conduct and or business

practices;

5.   For an award of statutory damages according to proof;

6.   For an award of general damages according to proof;

7.   For an award of special damages according to proof;

8.   For exemplary damages;

9.   For an order requiring Defendant to cease and desist from engaging in the

wrongful conduct alleged herein and to engage in a corrective advertising

campaign; and

10.   For attorneys' fees and expenses pursuant to all applicable laws.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action so triable.

Dated: May 14, 2014    Respectfully submitted,


        <u>/s/  Karen M. Leser-Grenon</u>
        James E. Miller (ct21560)
        Karen M. Leser-Grenon (ct023587)
        Shepherd, Finkelman, Miller & Shah, LLP
        65 Main Street
        Chester, CT  06412
        (860) 526-1100
        (866) 300-7367 (facsimile)
        jmiller@sfmslaw.com
        kleser@sfmslaw.com

        Natalie Finkelman Bennett
        James C. Shah
        Shepherd, Finkelman, Miller & Shah, LLP
        35 E. State Street
        Media, PA 19063
        (610) 891-9880
        (866) 300-7367 (facsimile)
        nfinkelman@sfmslaw.com
        jshah@sfmslaw.com

        Rose F. Luzon
        Valerie L. Chang
        Shepherd, Finkelman, Miller & Shah, LLP
        401 West A Street, Suite 2350
        San Diego, CA  92101
        (619) 235-2416
        (866) 300-7367 (facsimile)
        rluzon@sfmslaw.com
        vchang@sfmslaw.com

        Attorneys for Plaintiff and the Proposed Class